**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No.  08-cv-00254-REB-KMT

MARY McCLENAHAN,

      Plaintiff,

v.

METROPOLITAN LIFE INSURANCE COMPANY, a New York Insurance Company, and
THE KROGER CO. HEALTH AND WELFARE BENEFIT PLAN, an ERISA welfare
benefit plan,

      Defendants.

---

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

**Blackburn, J.**

      This matter is before me on the following motions: (1) **Defendants' Combined
Motion and Supporting Brief for a Bench Trial on the Papers** [#34][1] filed November
7, 2008; and (2) **Plaintiff's Combined Cross-Motion and Brief in Support for
Summary Judgment To Reverse Defendants' Decision To Terminate Her Long-
Term Disability Benefits** [#38] filed November 7, 2008.  The parties filed responses
[#41 & #43] and replies [#46 & #49] addressing both motions.  I grant the defendants'

---

[1]  "[#34]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's electronic case filing and management system (CM/ECF). I use this
convention throughout this order.

motion, and I deny the plaintiff's motion.[2]

## I.  JURISDICTION

I have jurisdiction over this case under 18 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1) and (f) (ERISA).

## II.  FACTS

The plaintiff, Mary McClenahan, was an employee of Kroger Company.  As a Kroger employee, McClenahan was entitled to benefits under the defendant Kroger Company Health and Welfare Benefit Plan (Plan).  The Plan is an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 (ERISA).  29 U.S.C. §§ 1001 - 1461.  The defendant Metropolitan Life Insurance Company (MetLife) provides long term disability (LTD) insurance as part of the Plan's benefits.

On December 10, 2003, McClenahan discontinued her employment with Kroger due to a chronic neck and back condition.  She applied for LTD benefits under the Plan, and MetLife granted her LTD benefits under the Plan.  Subsequently, MetLife terminated or limited McClenahan's LTD benefits under the Plan.  The first two terminations were rescinded by MetLife.  After McClenahan had received LTD benefits under the Plan for 24 months, MetLife terminated McClenahan's benefits as of March 13, 2006.   McClenahan challenged the third termination via MetLife's internal appeal procedures, but MetLife upheld the termination.  McClenahan has received 24 months of LTD benefits to date.

---

[2] The issues raised by and inherent to the cross motions for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the briefs. *Cf.* FED. R. CIV. P. 56(c) and **(d)**. ***Geear v. Boulder Cmty. Hosp.****,* 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

In the present lawsuit, McClenahan challenges the propriety of MetLife's termination of McClenahan's LTD benefits.  McClenahan argues that the administrative record in her case establishes that she is entitled to continued benefits under the MetLife LTD policy.  MetLife argues that the evidence in the administrative record does not support McClenahan's claim for continuing LTD benefits.  I will refer to the administrative record [#22] by page number, e.g. "Rec. 1."  I describe further below the administrative record and the medical evidence in the administrative record.  The parties both cite certain medical evidence in the administrative record in support of their positions.

### III.  STANDARD OF REVIEW

The parties disagree about the applicable standard of review in this case. I must address and resolve this issue before addressing the propriety of MetLife's decision to terminate McClenahan's LTD benefits.

ERISA provides a detailed and comprehensive set of federal regulations governing the provision of benefits to employees by employers.  Under 29 U.S.C. § 1132(a), part of ERISA, a plan beneficiary has the right to federal court review of benefit denials and terminations. The statute does "not establish the standard of review for such decisions."  ***Chambers v. Family Health Plan Corp.***, 100 F.3d 818, 824-25 (10th Cir.1996).  In ***Firestone Tire & Rubber Co. v. Bruch***, 489 U.S. 101 (1989), the Supreme Court established the basic framework for determining the standard of review in ERISA cases that challenge the denial or termination of benefits.  "(A) denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  ***Firestone***, 489

U.S. at 115.  If the plan provides for such discretion, then the proper standard of review

is abuse of discretion.  *Id*.

> ***Firestone*** left open the issue of what evidence may be considered
> by a federal court in an action under § 1132(a)(1)(B) when de novo review
> is required. [The Tenth Circuit], along with the majority of other federal
> courts of appeals, has held that in reviewing a plan administrator's
> decision for abuse of discretion, the federal courts are limited to the
> "administrative record" - the materials compiled by the administrator in the
> course of making his decision.

***Hall v. UNUM Life Ins. Co. of America***, 300 F.3d 1197, 1200 -1201 (10th Cir. 2002).

Although consideration of evidence beyond the administrative record is not precluded

absolutely, the United States Court of Appeals for the Tenth Circuit has held that only

exceptional circumstances warrant the admission of such additional evidence.  ***Jewell***

***v. Life Ins. Co. of North America***, 508 F.3d 1303 (10th Cir. 2007).[3]

The MetLife Plan at issue in this case contains a discretionary review clause,

which provides:

> In carrying out their respective responsibilities under the Plan, the Plan
> administrator and other Plan fiduciaries shall have discretionary authority
> to interpret the terms of the Plan and to determine eligibility for an
> entitlement to Plan benefits in accordance with the terms of the Plan.  Any
> interpretation or determination made pursuant to such discretionary
> authority shall be given full force and effect, unless it can be shown that
> the interpretation or determination was arbitrary and capricious.

Rec. 38.  McClenahan concedes that the Plan grants discretion to the plan

administrator.  However, McClenahan argues that the decision she challenges in this

case is subject to a different standard of review.  First, McClenahan argues that a

recently adopted Colorado statute alters the applicable standard of review.  Second,

McClenahan argues that even if the Colorado statute is not applicable, MetLife's

---

[3] No such exceptional circumstances exist here.

inherent conflict of interest requires the application of a standard of review that is more stringent than the abuse of discretion standard of review.

A.  Colorado Statute

On August 6, 2008, §10-3-1116, C.R.S., became effective.  In relevant part, this

statute provides:

> An insurance policy, insurance contract, or plan that is issued in this state
> that offers health or disability benefits shall not contain a provision
> purporting to reserve discretion to the insurer, plan administrator, or claim
> administrator to interpret the terms of the policy, contract, or plan or to
> determine eligibility for benefits.

McClenahan argues that this statute is applicable to her disability coverage under the

Plan and requires that MetLife's denial of continued benefits be reviewed de novo by

this court.

**i. Express Preemption** - MetLife argues that this Colorado statute is preempted

by ERISA and is not applicable to this case.  29 U.S.C. § 1144(a) provides that "[e]xcept

as provided in subsection (b) of this section, the provisions of this subchapter and

subchapter III of this chapter shall supersede any and all State laws insofar as they may

now or hereafter relate to any employee benefit plan."  This provision is known as

ERISA's express preemption clause.  Subsection (b)(2)(A) of § 1144 provides "(e)xcept

as provided in subparagraph (B), nothing in this subchapter shall be construed to

exempt or relieve any person from any law of any State which regulates insurance,

banking, or securities."  This provision is known as ERISA's savings clause.

McClenahan argues that §10-3-1116, C.R.S., is a state regulation of insurance that falls

within the ERISA savings clause, and, thus, is applicable to this case.

MetLife relies on the bipartite test for analyzing express preemption of state laws

under § 1144(a), as enunciated in *Kentucky Ass'n of Health Plans, Inc. v. Miller*, 538

U.S. 329 (2003).  In *Miller*, the Court held that a state law falls within ERISA's savings

clause, and is not preempted by ERISA, only if the law both (1) is "specifically directed

toward entities engaged in insurance"; and (2) "substantially affect(s) the risk pooling arrangement between the insurer and the insured." *Id.*, at 342.   McClenahan and MetLife agree that  §10-3-1116, C.R.S., is directed specifically toward entities engaged in insurance. I agree also. Thus, the key question is whether or not this Colorado statute substantially affects the risk pooling arrangement between the insurer and the insured. I conclude that, under applicable law, the Colorado statute in question here affects substantially the risk pooling arrangement between the insurer and the insured, and, thus, satisfies the second factor of the *Miller* test.

The state statutes at issue in *Miller* prohibited health insurance plans from excluding from participation in the plan any service provider located within the geographic coverage area of the plan who is willing to meet the terms and conditions for participation in the plan as a service provider.  The Court referred to these statutes as "any willing provider" (AWP) statutes.  *Miller*, 538 U.S. at 332.  The Court concluded that the AWP statutes had a substantial effect on the risk pooling arrangement between the insurer and the insured because, "by expanding the number of providers from whom an insured may receive health services, AWP laws alter the scope of permissible bargains between insurers and insureds in a manner similar to" certain other state laws the Court had upheld in the face of claims of ERISA preemption. 538 U.S. at 338 - 339.

One year before *Miller*, the Court decided *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355 (2002).  The Illinois law at issue in *Rush* required health maintenance organizations (HMO), including those covered by ERISA, to provide a mechanism for the timely review of any dispute between an insured and an HMO concerning the medical necessity of a procedure for which an insured claimed coverage.  The state law required that the HMO provide an independent reviewing

physician to review disputes about medical necessity,  and required an HMO to provide the covered service if the reviewing physician determined that the covered service is medically necessary.  536 U.S. at 361.  Rush argued that the state requirement was preempted by ERISA.

The *Rush* Court concluded that the state law in question was within the ERISA savings clause and was not preempted by ERISA.  536 U.S. at 364 - 375.  Applying the pre-*Miller* test for determining the applicability of the ERISA savings clause, the Court noted:

> Illinois has chosen to regulate insurance as one way to regulate the practice of medicine, which we have previously held to be permissible under ERISA.  While the statute designed to do this undeniably eliminates whatever may have remained of a plan sponsor's option to minimize scrutiny of benefit denials, this effect of eliminating an insurer's autonomy to guarantee terms congenial to its own interests is the stuff of garden variety insurance regulation through the imposition of standard policy terms.  It is therefore hard to imagine a reservation of state power to regulate insurance that would not be meant to cover restrictions of the insurer's advantage in this kind of way.

536 U.S. at 387.  Although the *Rush* court applied the pre-*Miller* test for evaluating the applicability of the ERISA savings clause, the *Rush* analysis still is informative.  In *Miller*, the Court analogized to *Rush* and cited *Rush* favorably.  *Miller*, 538 U.S. at 339. The Court's adoption of a refined, yet simplified, test preemption test in *Miller* did not invalidate entirely the Court's analysis in *Rush*; rather, *Miller* refined the *Rush* analysis. It is noteworthy that in *Rush* the Court concluded that state regulation designed to eliminate a plan sponsor's option to minimize scrutiny of benefit denials fell within the power to regulate insurance that is reserved to the states under ERISA.  *Rush*, 536 U.S. at 387.

In the present case, the Colorado statute in question prohibits terms in insurance

policies, contracts, or plans that purport to reserve discretion to the insurer, plan administrator, or claim administer in interpreting the policy or determining eligibility for benefits.  This statute satisfies both prongs of the *Miller* test.   First, the statute is directed specifically toward entities engaged in insurance.  Again, this point is not in dispute in this case.  Second, the statute substantially affects the risk pooling arrangement between the insurer and the insured.  The statute "alter[s] the scope of permissible bargains between insurers and insureds."  *Miller*, 538 U.S. at 338-339.  To a great extent, enforcement of the Colorado statute would dictate "to the insurance company the conditions under which it must pay for the risk that it has assumed." *Id*. at 339, n. 3.  This dictate, as applied to an insurance agreement, "certainly qualifies as a substantial effect on the risk pooling arrangement between the insurer and insured." *Id*. Based primarily on the holdings in *Miller* and *Rush*, I conclude that §10-3-1116, C.R.S., is not expressly preempted by ERISA.

    **ii.  Conflict Preemption** - MetLife argues also that §10-3-1116, C.R.S., is preempted by ERISA because the Colorado statute conflicts directly with the relevant provisions of ERISA.  MetLife argues that the statute is aimed at changing the way federal courts review benefits claims under ERISA and conflicts directly with ERISA's remedial scheme.  The conflict arises, MetLife argues, because the statute would eliminate the application of the arbitrary and capricious standard of review in all Colorado ERISA cases.

        The Supreme Court addressed a similar argument in *Rush*.

        ERISA itself provides nothing about the standard [of review].  It simply
        requires plans to afford a beneficiary some mechanism for internal review
        of a benefit denial, 29 U.S.C. § 1133(2), and provides a right to a
        subsequent judicial forum for a claim to recover benefits, § 1132 (a)(1)(B).
        Whatever the standards for reviewing benefit denials may be, they cannot

conflict with anything in the text of the statute, which we have read to require a uniform judicial regime of categories of relief and standards of primary conduct, not a uniformly lenient regime of reviewing benefit determinations.

Not only is there no ERISA provision directly providing a lenient standard for judicial review of benefit denials, but there is no requirement necessarily entailing such an effect even indirectly. When this Court dealt with the review standards on which the statute was silent, we held that a general or default rule of de novo review could be replaced by deferential review if the ERISA plan itself provided that the plan's benefit determinations were matters of high or unfettered discretion.  Nothing in ERISA, however, requires that these kinds of decisions be so "discretionary" in the first place; whether they are is simply a matter of plan design or the drafting of an HMO contract.  In this respect, then, [the state statute at issue] prohibits designing an insurance contract so as to accord unfettered discretion to the insurer to interpret the contract's terms. As such, it does not implicate ERISA's enforcement scheme at all, and is no different from the types of substantive state regulation of insurance contracts we have in the past permitted to survive preemption, such as mandated-benefit statutes and statutes prohibiting the denial of claims solely on the ground of untimeliness.

*Rush*,  536 U.S. at 385-386 (citations omitted).

The same analysis applies in this case.  The Colorado statute in question prohibits designing a health or disability insurance contract to reserve to the insurer or applicable administrator discretion to interpret the contract or determine eligibility for benefits.  As in *Rush*, this prohibition does not conflict directly with the provisions of ERISA.  Further, the Colorado statute in question here does not conflict with ERISA's enforcement scheme, which specifies the remedies available for an alleged violation of ERISA.

**iii.  Retroactive Application of §10-3-1116, C.R.S.** - Again, §10-3-116, C.R.S., became effective August 6, 2008, after all of the events relevant to the present case had occurred, including the filing of the present lawsuit.  If this statute is applicable to this case, then the statute is applicable retrospectively.

The Colorado Constitution provides that "[n]o ex post facto law, nor law . . . retrospective in its operation . . . shall be passed by the general assembly." Colo. Const. art. II, § 11.   Colorado's constitutional proscription against any law "retrospective in its operation" has been interpreted to prohibit any act "which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already (past)." *Continental Title Co. v District Court*, 645 P.2d 1310, 1314 (Colo. 1982) (quoting *Moore v. Chalmers-Galloway Live Stock Co.*, 90 Colo. 548, 554, 10 P.2d 950, 952 (1932)).  However,

> application of a statute to a subsisting claim for relief does not violate the prohibition of retroactive legislation where the statute effects a change that is only procedural or remedial in nature. This is because the abolition of an old remedy, or the substitution of a new one, neither constitutes the impairment of a vested right nor the imposition of a new duty, for there is no such thing as a vested right in remedies.

*Continental Title Co.*, 645 P.2d at 1315 (quotation and citations omitted).  In *Continental Title*, the court concluded that a new statute providing an alternative remedy for vindication of an alleged discriminatory and unfair employment practice properly could be applied retroactively to a claim that pre-dated the new statute.  The court noted that the new statute did not remove an affirmative defense that might otherwise be asserted, and it did not create new substantive rights by retroactively changing what formerly was a lawful employment practice into an unlawful employment practice.  *Id.* at 1315.

In the present case, the Plan gives the defendants discretionary authority to interpret the terms of the Plan and to determine eligibility for an entitlement to the Plan benefits, and provides that the defendants' determinations shall stand unless they are

shown to have been arbitrary and capricious.  These standards are not created by

statute, but are specified in the Plan documents.  The Plan documents are a contract

between the plaintiff and the defendants.  In this circumstance, I conclude that

application of §10-3-116, C.R.S., to this dispute constitutes an improper retrospective

application of the statute.  The Plan documents, a contract, specify the standards under

which interpretation of the Plan terms and eligibility for benefits are to be determined.

The Plan documents create obligations and duties for MetLife and specifies the scope

of those obligations and duties.  Retroactive application of  §10-3-116, C.R.S., would

alter significantly those defined obligations and duties and would, in effect, create new

and enhanced obligations and duties for MetLife.  The retrospective creation of such

enhanced duties and obligations is prohibited under Article II, §11 of the Colorado

Constitution.  Thus, I conclude ultimately that Section 10-3-116, C.R.S., may not be

applied in this case.

B.  Conflict of Interest

The United States Supreme Court held recently that when an ERISA insurer

holds a dual role in which it "both determines whether an employee is eligible for

benefits and pays benefits out of its own pocket" that insurer has a conflict of interest.

***Metropolitan Life Ins. Co. v. Glenn***, ___ U.S. ___, 128 S.Ct. 2343, 2346 (2008).

MetLife concedes that it is has a conflict of interest of the type addressed in ***Glenn***

because it has the dual capacity of claim administrator and insurer of the Plan.

*Defendants' Response* [#41], filed December 5, 2008, p. 8.  When an arbitrary and

capricious standard of review is applicable and the ERISA insurer holds such a dual

role, the insurer's conflict of interest "should be weighed as a factor in determining

whether there (was) an abuse of discretion" when the plan made the challenged

12

decision.  *Glenn*, ___ U.S. at ___, 128 S.Ct. at 2350.  In the present context, the terms arbitrary and capricious and abuse of discretion carry the same meaning.  *Id*. at ___, 128 S.Ct. at 1010 n. 10.  The *Glenn* Court explicitly declined to "create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict."  *Id*. at ___, 128 S.Ct. at 2351.

The United States Court of Appeals for the Tenth Circuit has addressed the application of *Glenn* to a case in which an ERISA plan administrator or fiduciary has a conflict of interest.  In such a case,

> we dial back our deference if "a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest." *Metro. Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2348, 171 L.Ed.2d 299 (2008) (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. 948). In such a situation, that "conflict should be weighed as a factor in determining whether there is an abuse of discretion." *Id*. at 2350 (internal quotation marks omitted) (quoting *Firestone*, 489 U.S. at 115, 109 S.Ct. 948); see also *Flinders*, 491 F.3d at 1189-90. To incorporate this factor, we have "crafted a 'sliding scale approach' where the 'reviewing court will always apply an arbitrary and capricious standard, but [will] decrease the level of deference given ... in proportion to the seriousness of the conflict.' " *Flinders*, 491 F.3d at 1190 (quoting *Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825-26 (10th Cir.1996)). This approach mirrors the *Glenn* Court's method  of accounting for the conflict-of-interest factor. See *Glenn*, 128 S.Ct. at 2351-52 (explaining that factor should prove more or less important depending on the conflict of interest's magnitude).

*Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1010 -1011 (10th Cir. 2008).

McClenahan argues that MetLife's conflict of interest requires that the burden of proof in this case shift to MetLife.  In *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004), the Tenth Circuit held that such a shifting of the burden of proof is appropriate when a plan administrator operates under an inherent conflict of interest.  *Fought* was decided before the Supreme Court's decision in *Glenn*.  I conclude that such a shifting of the burden of proof no longer is proper when an

evaluator/payor conflict is present.  Again, the **Glenn** Court explicitly declined to "create special burden-of-proof rules, or other special procedural or evidentiary rules, focused narrowly upon the evaluator/payor conflict." **Id**. at ___, 128 S.Ct. at 2351. However, MetLife's conflict of interest must be considered as a factor in applying the abuse of discretion standard.

C.  Conclusion - Applicable Standard of Review

Section 10-3-1116, C.R.S., is not applicable to this case.  Although §10-3-1116, C.R.S., is not preempted by ERISA, application of this statute to this case would violate the provision of the Colorado Constitution concerning retrospective application of statutes.  My review of MetLife's benefits determinations is subject to the arbitrary and capricious standard of review established in **Firestone Tire & Rubber Co. v. Bruch**, 489  U.S. 101, 115 (1989).  However, I must "decrease the level of deference given . . . in proportion to the seriousness of" MetLife's conflict of interest insofar as that conflict has been shown to affect MetLife's decisions in this case.  **Weber v. GE Group Life Assur. Co.**, 541 F.3d 1002, 1010 -1011 (10th Cir. 2008).

Under the arbitrary and capricious standard of review, the Plan's decision need not be the only logical decision nor even the best decision.  Rather, the decision need only be sufficiently supported by facts known to the Plan to counter a claim that the decision was arbitrary or capricious.  The decision will be upheld unless it is not grounded on any reasonable basis. **Kimber v. Thiokol Corp.**, 196 F.3d 1092, 1098 (10th Cir. 1999).  The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness - even if on the low end." **Id**. (quoting **Vega v. National Life Ins. Serv., Inc.**, 188 F.3d 287, 297 (5th Cir. 1999)). Again, the level of deference accorded to the Plan will be adjusted in proportion to the

seriousness of the conflict of interest demonstrated by the record.

In reviewing MetLife's challenged decision, I may consider only the evidence and arguments that appear in the administrative record.  *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007).[4] Of course, it is proper also to consider the legal arguments and discussions of the administrative record contained in the parties' briefing.  I must focus on the evidence available to the Plan at the time of its challenged decision, and I may not admit new evidence or consider *post hoc* rationales.  *Id*.  In reviewing the Plan's decision, I consider only the rationale asserted by the Plan in the administrative record and then determine whether the decision, based on the asserted rationale, was arbitrary and capricious.  *Id*.  In conducting this review I must consider whether the decision (1) was the result of a reasoned and principled process; (2) is consistent with any prior interpretations by the plan administrator; (3) is reasonable in light of any external standards; and (4) is consistent with the purposes of the plan.  *Id* at 1193.  Again, in applying the arbitrary and capricious standard, I must consider also MetLife's conflict of interest.

## IV.  PROCEDURAL POSTURE

The plaintiff has filed a motion for summary judgment.  The defendant has filed a motion for a bench trial on the papers.  The defendant notes that the United States Court of Appeals suggested recently that dispositive motions in an ERISA review case should be postured either as a motion for summary judgment or as a motion for a bench trial on the papers.  *Jewell v. Life Ins. Co. of North America*, 508 F.3d 1303, 1307

---

[4]  McClenahan has sought to introduce evidence in addition to the administrative record.  In a separate order, I grant MetLife's motion in limine [#42] in which MetLife asks that I exclude the additional evidence proffered by McClenahan.

(10th Cir. 2007).

Generally, summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  **FED.R.CIV.P.** 56(c); **Celotex Corp. v. Catrett**, 477 U.S. 317, 322 (1986).  In this case, the administrative record provides all of the relevant facts and there is no contention that the administrative record is incomplete or inaccurate.  The undisputed and relevant facts are established, and the only remaining question is an evaluation of MetLife's benefits determination, which is based on the administrative record, under the legal standard of review outlined above.  After this review is complete, either the plaintiff or the defendants necessarily will be entitled to judgment as a matter of law.  Given these circumstances, I conclude that the parties' motions properly can be treated as motions for summary judgment.[5]

## V.  REVIEW OF METLIFE'S BENEFITS DETERMINATION

The Plan contains a provision titled "Limitations for Disabilities Due to Particular Conditions."  Rec. 23.  This provision provides, *inter alia*, that disability benefits are limited to 24 months during the claimant's lifetime if the claimant is disabled due to a:

> Neuromusculoskeltal and soft tissue disorder, including, but not limited to, any disease or disorder of the spine or extremities and their surrounding sort tissue; including sprains and strains of joints and adjacent muscles, unless the Disability has objective evidence of
>
> a. seropositive arthritis;
>
> b. spinal tumors, malignancy, or vascular malformations;
>
> c. radiculopathies;
>
> d. myelopathies;

---

[5] My conclusion obviates the necessity for a separate nonjury trial. Thus the nonjury trial now set to commence May 11, 2009, should and will be vacated.

e. traumatic spinal cord necrosis; or

f. musculopathies.

The Plan terms quoted above concerning the 24 month limitation on benefits for disabilities due to a neuromusculoskeltal and soft tissue disorder is the key Plan term at issue in this case. *Plaintiff's cross-motion* [#38], filed November 7, 2008, p. 17.  I will refer to this Plan term as the 24 Month Limitation.

Again, McClenahan received disability benefits under the Plan for 24 months, but MetLife has concluded that she is not entitled to payment of disability benefits beyond 24 months under the terms of the Plan.  McClenahan challenges MetLife's determination, arguing that MetLife's interpretation of the 24 Month Limitation is unreasonable and that MetLife's evaluation of the medical evidence is unreasonable.  It is undisputed that McClenahan is disabled due to a neuromusculoskeltal and soft tissue disorder.  However, MetLife denied McClenahan's claim for continued disability benefits because MetLife concluded that McClenahan's continued disability does not include objective evidence of radiculopathies.  McClenahan disagrees, but does not argue that she satisfies any of the other exceptions stated in the 24 Month Limitation.

MetLife's denial of continued disability benefits is based on its conclusion that, after McClenahan had received benefits for 24 months, the medical record did not include "clinical evidence of active or ongoing radiculopathy."  *November 26, 2006, denial of benefits letter*, Rec. 142.

> Fundamentally, there was insufficient objective medical evidence to support any of the exclusionary diagnoses listed above including current objective evidence of radiculopathy.  Old diagnostic reports indicating evidence of "chronic denervation" at L5 do not support current or continuing evidence of radiculopathy.  The March 2006 EMG specifically indicated there was no evidence of "acute" finding from the entire lumbosacral spine area tested.  Reports found in the file relating to

17

cervical spine complaints appeared to be incomplete diagnostically and did not clearly establish objective evidence of radiculopathy in that region either.

*Id.*, Rec. 141.  MetLife asserted the same basis for denying benefits in its letter of April 6, 2007.  Rec. 242 - 245.  Again, the application of the radiculopathy exception, as stated in the 24 Month Exception, is the only basis on which McClenahan challenges MetLife's benefits determination.

The Plan defines the term "disability," in relevant part, as meaning that "due to sickness . . . you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis," and the covered party suffers a defined loss of earning as "a direct result of your sickness . . . ."  Rec. 14 - 15.

The Plan defines the term "radiculopathies" as "(d)isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology."  Rec. 23.  The discussion of this condition in the record indicates that the terms denervation and neuropathy or polyneuropathy are associated with radiculopathies.

### A.  Interpretation of the Plan

An ERISA plan administrator is bound by the terms of the plan.  Under the arbitrary and capricious standard of review, a plan administrator's interpretation of the plan may not be overturned by a court if the interpretation is reasonable.  ***Flinders***, 491 F.3d at 1193.  A reviewing court need not determine that the plan's interpretation was the only logical interpretation, or the best interpretation.  *Id*.  Rather, the plan's interpretation will be upheld unless it is not grounded on any reasonable basis.  *Id*.

Again, as applicable to this case, the Plan requires continued disability benefits beyond 24 months if the claimant is disabled due to a neuromusculoskeltal and soft tissue disorder and the disability has objective evidence of radiculopathies.  In her

briefs, McClenahan argues that the key question concerning the applicability of the 24

Month Limitation is "whether radiculopathy was present when the limitation provision

came into play on March 13, 2006." *Plaintiff's cross-motion* [#38], filed November 7,

2008, p. 23; *Plaintiff's response* [#43], filed December 5, 2008, p. 15.  In general,

MetLife agrees that the key question is whether there was sufficient objective evidence

of radiculopathy when McClenahan sought a continuation of benefits under the

radiculopathy exception to the 24 Month Limitation.  *Defendant's response* [#41], filed

December 5, 2008, p. 9.  However, MetLife argues also that McClenahan was required

to show that she suffered from the "ongoing disease of radiculopathies in order to

satisfy the exception to the 24 Month Limitation."  *Id*., p. 11.  McClenahan argues that

MetLife improperly enhanced the requirements of the 24 Month Limitation by requiring

McClenahan to demonstrate current or continuing or consistent radiculopathy at the

time MetLife determined McClenahan's entitlement to benefits beyond 24 months.

MetLife argues that it reasonably interpreted the 24 Month Limitation to require

evidence of the ongoing disease of radiculopathies to satisfy the radiculopathies

exception to the 24 Month Limitation.

McClenahan objects also to MetLife's interpretation of the 24 Month Limitation to

the extent MetLife relies on the fact that certain medical reviewers concluded that there

is no objective evidence that McClenahan has consistent or significant radiculopathy.

McClenahan argues that there is "no requirement in the Plan that Ms. McClenahan

prove any particular degree of radiculopathy, whether significant or not, but only that

there is 'objective evidence of' radiculopathy."  *Plaintiff's reply* [#46], filed December 18,

2008, p. 6.  In essence, McClenahan argues that even evidence of insignificant

radiculopathy is sufficient to satisfy the 24 Month Limitation.  *Id*.  MetLife argues that

McClenahan can satisfy the 24 Month Limitation only if she shows that her disabling neuromusculoskeltal and soft tissue disorder arose out of radiculopathies, or that radiculopathies is a significant element of the disability.

Although the term 24 Month Limitation is open to some differing and reasonable interpretations, I conclude that MetLife's interpretation of the 24 Month Limitation is reasonable.  The 24 Month Limitation clearly is designed to limit MetLife's potential liability for disabilities due to neuromusculoskeltal and soft tissue disorders.   After MetLife has paid benefits for 24 months, benefits cease unless the claimant demonstrates a continuing disability that is due to, *inter alia*, radiculopathies.  The Plan's definition of the term disability provides that a claimant must show that as a "direct result" of a sickness, the claimant suffers a "loss of earnings," as that term is defined in the Plan.  When the 24 Month Limitation becomes applicable, the relevant sicknesses are limited to the six conditions listed in the 24 Month Limitation.  In this context, it is reasonable for MetLife to require a claimant to show that one of the six specified conditions was in existence or was present at the time the claimant seeks benefits under the 24 Month Limitation, and that one of the six conditions is a significant cause of the claimant's continuing disability.  In other words, it is reasonable for MetLife to interpret these Plan terms to require McClenahan to show that her disabling neuromusculoskeletal and soft tissue disorder arose out of radiculopathies, or that radiculopathies is a significant element of her disability.

McClenahan contends that MetLife's requirement that McClenahan show current or continuing or consistent radiculopathy is not a reasonable interpretation of the 24 Month Limitation.  I disagree.  McClenahan agrees that she is required to show objective evidence that radiculopathies were present when the initial 24 month benefit

period expired.  It is reasonable to restate this requirement as a requirement that

McClenahan show current radiculopathies at the time the initial benefit period expired.

Current radiculopathies are present radiculopathies.  Alternatively, it is reasonable to

restate this requirement as a requirement that McClenahan show that radiculopathies

were continuing at the time the initial benefit period expired.  Radiculopathies that are

continuing at the relevant point in time are present radiculopathies.

Of course, if McClenahan were not required to show that radiculopathies were

present when the initial 24 month benefit period expired, then she arguably could base

a claim for continued disability benefits on a showing that radiculopathies existed at

some other time, even though radiculopathies did not contribute to her disability at the

time she sought continued benefits.  McClenahan does not argue for such a reading of

the 24 Month Limitation, and this is not a reasonable reading of the limitation.  The

terms of the Plan indicate clearly that the Plan is designed to provide coverage during

the existence of certain disabilities.  The Plan is not designed to provide continuing

coverage based on the fact that a covered disability existed at one point in time, even

though that covered disability does not exist at the time coverage is claimed.  Like

virtually all disability plans, the Plan provides that coverage will end, *inter alia*, at the end

of the period specified in the Limitation for Disabilities Due to particular conditions or the

date you are no longer Disabled.  Rec. 14.

### B.  Application of the Plan

McClenahan argues that she presented to MetLife objective evidence of the

existence of radiculopathy at the time the 24 Month Limitation became applicable.  She

argues that MetLife acted arbitrarily and capriciously by ignoring this evidence, and by

relying on the opinions of MetLife's reviewing physicians.  Met Life argues that the

objective medical evidence in the record "does not support the conclusion that McClenahan had the ongoing disease of radiculopathies in order to satisfy the exception to the 24 Month Limitation." *Defendant's response*, [#41], filed December 5, 2008, p. 11.  I conclude that MetLife's review and interpretation of the evidence on the key issue, the existence of radiculopathies at the time the 24 Month Limitation became applicable, was reasonable and was not arbitrary and capricious.

**i. McClenahan's Objective Medical Evidence** - McClenahan cites a variety of medical records in support of her contention that the medical records available to MetLife included objective evidence of the existence of radiculopathy at the time the 24 Month Limitation became applicable.  She cites: (1) the report of R. Mark Lohr, M.D., dated July 10, 2003 (Rec. 587); (2) a lumbar spine MRI, dated September 24, 2003 (Rec. 613); (3) a CT myelogram of the lumbar spine performed on October 29, 2003 (Rec 616); (4) the report of Dr. Kumar, dated February 9, 2004 (Rec. 1028); (5) diagnoses of "left lower limb radiculopathy" both before and after surgery to perform a L3-4 laminectomy, nerve root decompression, and L3-L5 posterior fusion performed on February 12, 2004 (Rec. 106); (6) the observation of radicular symptoms by Dr. Lohr on March 28, 2005 (Rec. 577); and (7) Dr. Kumar's notation of complaints of radiculopathy down McClenahan's fingers on May 5, 2005 (Rec. 590).  These records provide evidence of radiculopathy but, of course, all of these records pre-date the crucial point in time, the expiration of the 24 month benefit period.

McClenahan relies most heavily on the affidavit of John Drye, M.D., one of her treating physicians, dated August 13, 2007.  In his affidavit, Dr. Drye discusses his treatment and examination of McClenahan and the results of an electromyography (EMG) that was performed on March 9, 2006.  Dr. Drye concludes that the results of the

EMG provide objective evidence of radiculopathies.  Rec. 206.  He notes also that this is consistent with his examinations of McClenahan.  *Id.*  March 9, 2006, was four days prior to the expiration of the initial 24 month benefit period.  McClenahan argues also that the reports completed by MetLife's reviewing physicians, which are summarized below, also substantiate McClenahan's radiculopathy at the relevant time.

The March 9, 2006, EMG test was conducted by John V. Stephens, M.D.  Rec. 202.  Dr. Stephens states in his report that there "is no EMG evidence of acute denervation in the L3 thru S2 distribution.  However, there is some evidence of what appears to be chronic denervation likely in a left L5 pattern.  Fairly good motor function is preserved."  *Id.*  Dr. Stephens noted also that there is no nerve conduction evidence of "peripheral entrapment neuropathy in the lower extremities" "nor any evidence of a generalized peripheral polyneuropathy."   *Id.*

**ii.  MetLife's Objective Medical Evidence** - MetLife reviewed the medical evidence submitted by McClenahan.  In addition, an in-house physician for MetLife, Dr. Gordan, two independent reviewing physicians, Dr. Smith and Dr. Monkofsky, and two nurse consultants reviewed the medical record for MetLife.  MetLife argues that McClenahan's objective medical evidence is not sufficient to support her position, and MetLife argues that it reasonably relied on the evaluations of the nurse consultants and Drs. Gordan, Smith, and Monkofsky in support of its ultimate conclusion that McClenahan is not entitled to continued benefits under the policy.

Initially, Dr. Smith conducted an independent review of McClenahan's case for MetLife.  Based on Dr. Smith's report, MetLife reinstated benefits to McClenahan.  Rec. 94 - 97, 273.  The reinstated benefits were paid through the end of the initial 24 month benefit period, which ended on March 13, 2006.  Rec. 97.  MetLife submitted additional

questions to Dr. Smith as part of its effort to determine if McClenahan was entitled to benefits under the 24 Month Limitation.  Dr. Smith addressed these questions in a report dated January 29, 2007.  Rec. 273 - 275.  Dr. Smith noted that he had conducted an extended file review on December 28, 2006.  Addressing the 24 Month Limitation, Dr. Smith noted that of "the exclusionary diagnoses, the one that requires close evaluation in this case is radiculopathies."  Rec. 274.  He concluded that McClenahan "does not have consistent subjective complaints or objective findings on examination or testing consistent with significant radiculopathy . . . ."  *Id.*  Dr. Smith's report does not discuss specifically the March 9, 2006, EMG, although he does mention "recent exam findings."  Again, McClenahan argues that this EMG report provides objective evidence of radiculopathies four days before the 24 month period of initial benefits expired, and the terms of the 24 Month Limitation became applicable.

On March 27, 2007, a MetLife nurse consultant conducted a review to determine if there was objective evidence of exclusionary diagnoses under the 24 Month Limitation.  Reviewing all available medical records, including the results of two recent office visits with McClenahan's treating physician, Dr. Drye, the nurse consultant concluded that the new medial records provided by Dr. Drye continue to "demonstrate that there . . . are no radiculopathies . . . evident on exam. " Rec. 115.  The nurse consultant concluded also that McClenahan's diagnoses do not satisfy any of the exceptions stated in the 24 Month Limitation.  In this record and in many of the records in the administrative record, the 24 Month Limitation is referred to as the "LBD provision."

A second nurse consultant review was conducted in October, 2007.  Rec. 120 - 121.  This reviewer summarized the findings from examinations by McClenahan's

doctor in August, 2007, and the reviewer concluded that these examinations did not provide objective clinical evidence of a diagnosis that fit the exceptions to the 24 Month Limitation.  In this review, such an exception is referred to as an "LDB exclusionary diagnosis."  This reviewer noted the March 9, 2006, EMG.  This is the EMG discussed by Dr. Drye in his affidavit and relied on heavily by McClenahan.  After this review, MetLife again concluded that the record did not include objective evidence of a diagnosis that fell within the six exclusions in the 24 Month Limitation.  Rec. 121.

McClenahan's medical records were reviewed also by Dr. Monkofsky, a physician independent of MetLife.  Rec. 165 - 167.  MetLife asked Dr. Monkofsky to examine McClenahan's records to determine if there is any evidence that any of the six conditions exclusionary conditions listed in the 24 Month Limitation existed beyond March 16, 2006.  Rec. 165.  After reviewing medical records covering a "considerable period of time," Dr. Monkofsky concluded that the only diagnosis that may be at issue is radiculopathy.  *Id.*  Dr. Monkofsky's report discusses records as early as October, 2003. Ultimately, Dr. Monkofsky concluded that "there was insufficient objective medical evidence to support any of the exclusionary diagnoses . . . including current objective evidence of radiculopathy."  Rec. 166.  Immediately following this statement, Dr. Monkofsky discusses the March 2006, EMG on which McClenahan relies.  Dr. Monkofsky concludes that this report does "not support current or continuing evidence of radiculopathy."  *Id.*  He notes also that the EMG indicated that there "was no evidence of 'acute' findings from the entire lumbosacral spine area tested."  *Id.*

MetLife sent Dr. Monkofsky's report to Dr. Wilson and Dr. Drye, both of whom were McClenahan's treating physicians, for comment.  Dr. Drye responded with a brief note stating that he stands by his previous opinion that McClenahan has objective

evidence of radiculopathy.  Rec. 147.  Dr. Drye did not cite specific reasons for his conclusion.  Rec. 147.  A physician's assistant in Dr. Wilson's office responded to Met-Life, but the response does not address or dispute Dr. Monkofsky's conclusion that the record does not contain objective evidence or radiculopathies. Rec. 150.

On November 20, 2007, a MetLife nurse consultant conferred with a MetLife physician, Dr. Gordan, concerning the March 9, 2006, EMG and MRI reports.  Dr. Gordan concluded that these reports reflect only "a prior radiculopathy with no clinical evidence of active or ongoing radiculopathy."  Rec. 124.  The record indicates that MetLife then reviewed all of this information and concluded ultimately that there was "insufficient medical evidence to support any of the exclusionary diagnosis (sic) . . . including current objective evidence of radiculopathy beyond March 13, 2006."  Rec. 124 - 128, quotation on 128.

**iii.  Analysis** - Again, I conclude that it was reasonable for MetLife to interpret the Plan to require an evaluation of the objective evidence to determine if McClenahan's disability arose out of radiculopathies or that radiculopathies was a significant element of her disability, as of March 13, 2006, the date on which the 24 Month Limitation became applicable.  Thus, the key question in this case is whether or not MetLife had a reasonable basis to conclude that McClenahan's disability did not arise out of radiculopathies or that radiculopathies was not a significant element of her disability as of March 13, 2006.

The portions of the administrative record summarized above demonstrate that on several occasions MetLife reviewed the medical evidence to determine whether there was objective evidence of radiculopathies as of March 13, 2006, and at any point in time after that date during the period in which McClenahan's claim was reviewed.  The

doctors and nurse consultants who reviewed McClenahan's records for MetLife each concluded that the record did not demonstrate the existence of significant radiculopathy or active or ongoing radiculopathy.  Rec. 115, 124, 128,166, 274.  Some of MetLife's medical reviewers address specifically the March 9, 2006, EMG report, but concluded that this report does not support the conclusion that McClenahan suffered from radiculopathies beyond March 13, 2006.

Many of the medical records cited by McClenahan concern points in time significantly prior to the time when the 24 Month Limitation became applicable.  This evidence may have some relevance to an evaluation of McClenahan's disability, but it does not demonstrate that radiculopathies was a significant element of her disability at the relevant time, on and after March 13, 2006.  Again, McClenahan relies most heavily on the March 9, 2006, EMG report as objective evidence of radiculopathies only four days before the 24 Month Limitation became applicable.  Dr. Drye, McClenahan's treating physician, says this report provides objective evidence or radiculopathies.  MetLife's medical consultants disagree.  Further, MetLife's medical consultants all concluded that the medical records submitted by McClenahan concerning examinations of McClenahan conducted after March 13, 2006, also did not support the conclusion that McClenahan's disability was due to  significant radiculopathy or active or ongoing radiculopathy.

The analysis and opinions expressed by MetLife's medial reviewers provide a substantial evidentiary basis for MetLife to conclude reasonably that McClenahan's disability did not arise out of radiculopathies or that radiculopathies was not a significant element of her disability as of March 13, 2006.  Of course, Dr. Drye expressed a contrary opinion.  In the face of such conflicting opinions, MetLife must make a decision.

Nothing in the record demonstrates that Dr. Drye's opinion is significantly more compelling, reliable, or well founded such that it was unreasonable for MetLife to rely on the contrary opinions of MetLife's medical reviewers.  Further, nothing in the record indicates that the evaluations of MetLife's medical consultants are inherently flawed or unreliable.

When evaluating MetLife's decision under the arbitrary and capricious standard, I must consider whether the decision (1) was the result of a reasoned and principled process; (2) is consistent with any prior interpretations by the plan administrator; (3) is reasonable in light of any external standards; and (4) is consistent with the purposes of the plan. *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007).  In this case, I must consider also MetLife's conflict of interest and decrease the level of deference given to MetLife in proportion to the seriousness of the conflict.  *Weber v. GE Group Life Assur. Co.*, 541 F.3d 1002, 1010 -1011 (10th Cir. 2008).

The record in this case demonstrates that MetLife's evaluation of McClenahan's claim for continuing disability benefits was a reasoned and principled process.  MetLife conducted several evaluations of the relevant record and sought the evaluations of several medical professionals.   MetLife sought evaluations that focused on the facts relevant to the 24 Month Limitation.  Additionally, MetLife submitted the opinion of one of its medical evaluators to McClenahan's treating physicians for comment.  MetLife evaluated these facts and opinions in the context of a reasonable interpretation of the relevant Plan provisions.  The parties have not cited anything in the record that shows whether MetLife's interpretation of the plan is consistent with any prior interpretations by the plan administrator or that shows how MetLife's determination may relate to any

external standards.  Thus, I do not weigh these factors.  The parties do not address whether or not Met Life's determination is consistent with the purposes of the Plan.  The purposes of the Plan are reflected most directly in the terms of the Plan.  In the context of MetLife's reasonable interpretation of the applicable Plan provisions, I conclude that Met Life's decision is consistent with those provisions and, thus, is consistent with the purposes of the Plan.

Finally, I must assess the role of MetLife's evaluator/payor conflict of interest and decrease the  high level of deference accorded to MetLife under the arbitrary and capricious standard in proportion to the seriousness of the conflict.  The evaluator/payor conflict is serious.  However, nothing in the present record demonstrates that this conflict tainted MetLife's analysis of McClenahan's claim.  McClenahan suggests that the conflict of interest requires that the burden of proof by shifted to MetLife, citing *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1006 (10th Cir. 2004).  I have rejected this contention because the Supreme Court has rejected the application of special burden of proof rules based on an evaluator/payor conflict.  *Metropolitan Life Ins. Co. v. Glenn*, ___ U.S. ___, 128 S.Ct. 2343, 2351 (2008).

However, even if I adopted the shifting burden of proof standard of *Fought*, I conclude that MetLife's decision still would be upheld.  The *Fought* court concluded that when the burden of proof properly is shifted to the plan administrator,

> the plan administrator bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard.  In such instances, the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence.

*Fought*, 379 F.3d at 1006.  As discussed above, the record in this case demonstrates

that MetLife's interpretation of the relevant Plan provisions is reasonable and that substantial evidence supports MetLife's conclusion that McClenahan's disability did not arise out of radiculopathies or that radiculopathies was not a significant element of her disability as of March 13, 2006.

C.  Conclusion

Having reviewed carefully the parties' briefs and the relevant portions of the administrative record, I conclude that MetLife's benefits determination must be upheld. MetLife applied a reasonable interpretation of the relevant Plan provisions, and MetLife concluded reasonably, based on substantial evidence, that McClenahan's disability did not arise out of radiculopathies or that radiculopathies was not a significant element of her disability as of March 13, 2006.

**VI.  ORDERS**

**THEREFORE, IT IS ORDERED** as follows:

1.  That the **Defendants' Combined Motion and Supporting Brief for a Bench Trial on the Papers** [#34] filed November 7, 2008, which I have treated as a motion for summary judgment, is **GRANTED**;

2.  That the **Plaintiff's Combined Cross-Motion and Brief in Support for Summary Judgment To Reverse Defendants' Decision To Terminate Her Long-Term Disability Benefits** [#38] filed November 7, 2008, is **DENIED**;

3.  That the determination of the defendants, Metropolitan Life Insurance Company and the Kroger Co. Health and Welfare Benefit Plan, that plaintiff, Mary McClenahan, is not entitled to disability benefits under the Plan beyond March 13, 2006, is **UPHELD**;

4.  That **JUDGMENT SHALL ENTER** in favor of the defendants, Metropolitan

Life Insurance Company and the Kroger Co. Health and Welfare Benefit Plan, and against the plaintiff, Mary McClenahan;

5.  That the defendants, Metropolitan Life Insurance Company and the Kroger Co. Health and Welfare Benefit Plan, are **AWARDED** their costs to be taxed by the Clerk of the Court pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR 54.1; and

6.  That the Trial Preparation Conference set for May 8, 2009, at 9:00 a.m., and the trial scheduled to commence on Monday, May 11, 2009, are **VACATED**.

Dated May 7, 2009, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge